UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

In re:

      M&K Walker and Sons Trucking, LLC,

          Debtor.

Case No. 17-64328

Chapter 11

_____

### *EXPEDITED* MOTION TO APPROVE POST-PETITION ACCOUNTS RECEIVABLE FINANCING AND USE OF CASH COLLATERAL

***(Basis for Expedited Relief)***
***The Debtor requires accounts receivable financing to maintain its operations. Without accounts receivable financing, the Debtor will not have sufficient working capital to maintain its operations. Due to the nature of the Debtor's business and the Debtor's relationships with a certain customer, accounts receivable financing is necessary to maintain positive cash flow.***

      Debtor-in-possession, M&K Walker and Sons Trucking, LLC (the "Debtor" or "M&K"), through undersigned counsel, moves for the entry of an Order authorizing it to obtain and continue accounts receivable financing (the "DIP Financing") from WEX Bank ("Wex", "Fleet One" or "Lender"), a Utah corporation, use cash collateral pursuant to the attached Order provided by WEX, and in support thereof states as follows:

### JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 105 and 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### A. General Background

5.     On August 16, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No trustee, examiner or official committees have been appointed in this case.

### B.     The Debtor's Relationship with WEX

6.     Prior to the Petition Date, WEX and the Debtor entered into an Accounts Purchasing Agreement dated March 1, 2017, a true and correct copy of which is attached hereto as **Exhibit "A"** (the "Financing Agreement").

7.     Pursuant to the Financing Agreement, WEX agreed to provide accounts receivable financing to M&K. Upon the sale of each invoice, WEX advances to the Debtor 92% of the face value of each invoice. When the customer tenders payment, WEX advances the remaining 8%, less its factoring fees, which range from 1.75% to 2.25% depending on the number of outstanding days from collection. WEX maintains a "Reserve" account of 6% of the outstanding face value of invoices as security for its obligations.

8.     To continue its operations and maintain its cash flow, the Debtor requires accounts receivable financing. The Debtor sells to its customers on net 30 day terms, but customers in the industry regularly pay their invoices in 45 or 60 days. Debtor requests permission to continue this factoring arrangement and enter into the "Debtor in Possession Addendum to Accounts Purchase Agreement" attached hereto as **Exhibit "B".**

9.     Thus, factoring allows the Debtor to access 92% of its accounts receivable in 24 to 72 hours and the balance upon payment of the invoice from the customer. Without this accounts

receivable financing the Debtor will use as accessible sufficient working capital to expand its manufacturing and sales efforts.

10.    Debtor and Wex have agreed to grant, as adequate protection for any diminution in the value of its prepetition collateral, and the proceeds thereof, and Cash Collateral, and the proceeds thereof, a valid, perfected and enforceable first-priority security interest (the "Replacement Liens") in and upon all of the categories and types of collateral in which WEX Bank held a security interest and lien as of the Petition Date (the "Prepetition Collateral"), including, without limitation, Cash Collateral, and the proceeds thereof (collectively, all of the collateral described in this paragraph, the "Collateral").

## LEGAL ARGUMENT AND CITATION TO LEGAL AUTHORITY

11.    The Debtor is unable to obtain financing on more favorable terms from sources other than WEX. The Lender is vital to the Debtors continued post-petition business operations.

12.    Pursuant to 11 U.S.C. § 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Court may authorize the obtaining of credit. In the event the Debtor does not obtain post-petition accounts receivable financing, it will not have the available funds with which to continue business operations. Accordingly, the Debtor respectfully submits that obtaining post-petition financing is necessary in order to avoid immediate and irreparable harm to the Debtor.

13.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless each entity with an interest in such cash collateral consents or the Court authorizes such use, sale or lease.  Section 363(e) provides that the Court shall condition such use of cash collateral as is necessary to provide adequate protection of such interests. Section 363(p) provides that at a hearing on the use of cash collateral, the entity asserting an interest in the cash collateral has the burden of proof on the issue of the validity, priority, or extent of such interest, and the debtor-in-possession has the burden of proof on the issue of adequate protection.

14.    The Debtor submits that the proposed financing is in the best interest of the estate and its creditors, given the fact that the Debtor does not have the ability to obtain other financing

elsewhere. The Debtor submits that it cannot count on more favorable financing than that which is proposed in the time frame required to ensure uninterrupted cash flow.

WHEREFORE, the Debtor respectfully requests that the Court approve the proposed financing and cash collateral protection pursuant to the attached Order, authorize the Debtor to continue financing its accounts receivable with WEX and grant such other and further relief that is just and proper.

Dated: August 16th, 2017

Respectfully submitted,
/s/ Will Geer
Will Geer
Georgia State Bar No. 940493
Law Office of Will B. Geer, LLC
333 Sandy Springs Circle, NE
Suite 225
Atlanta, Georgia 30328
T: (678) 587-8740
F: (404) 287-2767
willgeer@willgeerlaw.com

This is to certify that on this date I served a true and correct copy of the within and

foregoing Emergency Motion For Entry Of An Interim Order Authorizing Use of Cash Collateral

upon the following parties by overnight mail, facsimile transmission, or electronic mail:

| | | |
|---|---|---|
| Office of the U.S. Trustee<br>362 Richard B. Russell Building<br>75 Ted Turner Drive, SW<br>Atlanta, Georgia 30303<br>USTP.Region21@usdoj.gov | Retail Capital, LLC<br>1250 Kirts Blvd<br>Suite 100<br>Troy, MI 48084<br>Fax: (888) 371-8950<br>info@retailcapital.com | Wex Bank<br>c/o Richard H. Fimoff<br>Robbins, Salomon & Patt, Ltd.<br>180 N. LaSalle Street<br>Suite 3300<br>Chicago, IL 60601<br>rfimoff@rsplaw.com |
| Balboa Capital Corp.<br>900 OLD ROSWELL LAKES PKWY<br>Suite 310<br>Roswell GA 30076-0000<br>Fax: 949-756-0886 | BMO Transportation Finance<br>300 E. Carpenter Frwy.<br>Suite 504<br>Irving TX 75062-0000<br>Fax: 972-767-4165 | ENGS Commercial Finance Co.<br>CT Corp. System<br>289 S Culver St.<br>Lawrenceville, GA 30046<br>customerservice@engsfinance.com |
| Hitachi Capital America Corp.<br>c/o Emmett Goodman 544 Mulberry St., St. 800 Macon GA 31201-0000<br>elgoodman@goodmanlaw.org | Paccar Financial Corp.<br>THE PRENTICE-HALL CORP. SYSTEM<br>40 TECHNOLOGY PKWY SOUTH, #300<br>Norcross, GA 30092<br>Fax: 425.468.8216 | MHC Kenworth, LLC<br>4040 Irving Blvd<br>Dallas TX 75247-0000<br>Fax: (214) 920-7316 |
| Georgia Department of Revenue<br>Compliance Division<br>ARCS - Bankruptcy<br>1800 Century Blvd NE, Suite 9100<br>Atlanta, GA 30345-3202<br>Fax: 404-417-2101<br>BHeinz@law.ga.gov | Internal Revenue Service<br>Centralized Insolvency Operation<br>Post Office Box 7346<br>Philadelphia, PA 19101-7346<br>Fax: 267-941-1015 | Wells Fargo Equip. Fin., Inc.<br>40 Technology Parkway South<br>Suite 300<br>Norcross GA 30092-0000<br>Fax: 612-667-9711 |

| | | |
|---|---|---|
| Atlanta Commercial The<br>1440 Stratfield Circle<br>Atlanta GA 30319-0000<br>Fax: 404 352-8261 | Speedco, Inc.<br>289 S. Culver St.<br>Lawrenceville, GA 30046<br>speedcocredit@bfusa.com | |

This 16th day of August, 2017.

> */s/ Will B. Geer*
> Georgia State Bar No. 940493
> Law Office of Will B. Geer, LLC
> 333 Sandy Springs Circle, NE
> Suite 225
> Atlanta, Georgia 30328
> T: (678) 587-8740
> F: (404) 287-2767

## ACCOUNTS PURCHASE AGREEMENT

**THIS ACCOUNTS PURCHASE AGREEMENT** (the "Agreement") is entered into and delivered on March 1, 2017 (the "Effective Date"), by and between **WEX BANK,** a Utah industrial bank company with its principal place of business located at 7090 Union Park Center, Suite 350, Midvale, UT  84047 (hereinafter referred to as ("WEX")  and **M & K WALKER & SONS TRUCKING LLC,** a Limited Liability Company, organized and existing under the laws of the State of Georgia (hereinafter referred to as "Client").

### RECITALS

**WHEREAS**, Client wishes to sell and assign its Accounts, as defined herein, to WEX making WEX its sole factor and the absolute owner of such Accounts; and

**WHEREAS**, WEX desires to purchase certain Accounts from Client pursuant to the terms of this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises and covenants set out below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**ARTICLE 1.  FACILITY TERMS.** The facility terms shall be as follows:

**1.1** ADVANCE RATE.  The Advance Rate shall be an amount equivalent to Ninety-Two Percent (92%) of the face value of each Account purchased by WEX.

**1.2** FACILITY AMOUNT. The Facility Amount shall mean One Hundred Fifty Thousand Dollars ($150,000.00), which represents the maximum aggregate amount of all Accounts purchased and outstanding.

**1.3** DISCOUNT RATE. The Discount Rate shall mean for each Account purchased and based on the face value of such Account from the date of purchase until payment in full is received by WEX, a discount fee of One and Three Quarters of One Percent (1.75%) for the first Thirty (30) days or increment thereof that such Account remains unpaid, and after such Thirty (30) day period an additional One Half of One Percent (0.50%) for every Sixty (60) day period or increment thereof that such Account remains unpaid up to the date of the indefeasible payment in full of such Account.

**1.4** RESERVES. Reserves due to Client shall be paid within five (5) business days from the date that each Account is paid in full by the Customer.

**1.5** MINIMUM MONTHLY FEE. The Minimum Monthly Fee shall be N/A ($0) per calendar month.

**1.6** EXCLUDED ACCOUNTS. The Excluded Accounts shall mean the Customers set forth on Schedule 1 attached hereto a made a part hereof by this reference.

**ARTICLE 2.  DEFINITIONS**

**A.** **CAPITALIZED TERMS.**  All capitalized terms used in this Agreement shall have the meanings ascribed to such terms as defined below or as otherwise defined in this Agreement, or, if not so defined in this Agreement, as such term is defined in the UCC.

**2.1** "Account" shall have the meaning as set forth in the UCC.

**2.2** "Assignment Schedule" shall mean the list of Accounts purchased from Client by WEX in a form acceptable to WEX.

**2.3** "Collateral" shall have the meaning set forth in Sections 3.1 hereof.

**2.4** "Customer" shall mean the person or entity indebted to Client due to the sale of goods or rendition of services for such Customer by Client.

**2.5** "Dispute" shall mean any alleged dispute, deduction, claim, offset, defense, counterclaim or other form of claim or deduction of any kind asserted by a Customer, whether or not bona fide, including, without limitation, any dispute relating to goods or services already paid for or relating to an Account other than the Account on which payment is being withheld or whether or not related to a specific Account.

**2.6** "Event of Default" shall mean any of the following:  (i) Client shall fail to pay when due any Obligation; (ii) Client breaches any representation, warranty or covenant set forth herein or any warranty, representation or covenant is not true, accurate or correct; (iii) the discontinuance or suspension of Client's present business operations; (iv) Client becomes insolvent or unable to meet its debts as they mature, or any proceeding is commenced against Client for relief under any provision of any federal or state bankruptcy, insolvency or other similar law or the appointment of a receiver, custodian or trustee of any kind for Client or any of Client's property; (v) any injunction, attachment, judgment or lien shall be filed, occur, arise or attach to any portion of the Collateral or as to Client; (vi) Client fails to perform any duty hereunder; (vii) any schedule, report, certificate, financial statement or other document furnished by Client to WEX or by any person on behalf of Client is untrue, incorrect or becomes untrue or inaccurate in any respect; (viii) Client shall fail to pay any federal or state tax or fail to timely file any tax form as and when due; (ix) a material adverse change occurs in Client's financial condition, business or operations; (x) a default occurs under any guaranty executed in conjunction with this Agreement; (xi) there is a change in the control of the ownership or management of Client; (xii) WEX in its sole discretion deems itself insecure and has reasonable cause to believe that the prospect of Client's performance under the Agreement appears jeopardized.

**2.7**   "<u>Obligation</u>" shall mean, without limitation, the aggregate amount of the Accounts purchased by WEX hereunder; debts, liabilities and obligations due to any warranty, representation or covenant and duties of every kind and description that Client owes to WEX under this Agreement or otherwise, direct or indirect, absolute or contingent and including those that WEX reasonably anticipates are likely to occur or that may adversely affect WEX's ability to collect the Accounts in the future; charges or chargebacks arising from Disputes or otherwise; costs and expenses, including reasonable attorneys' fees; any amounts recovered from WEX on account of payments previously made by Customers on Accounts purchased by WEX, including but not limited to any preference claims; and any taxes or penalties or other charges which WEX may be required to pay in connection with this Agreement or any transaction carried out in connection herewith.

**2.8**   "<u>Reserve</u>" shall mean the amount equivalent to the face value of each Account purchased from Client by WEX less the sum of the Advance Rate and the Discount due WEX, less other Obligations, fees or other amounts due WEX hereunder; and which shall serve as security for the Obligations.  WEX may in its sole and exclusive discretion, increase or decrease such Reserve as deemed necessary to protect WEX's interests. Until the respective Reserve amount for each Account is due Client as described hereunder, the Reserve amount retained by WEX pursuant to the terms of this Agreement shall be the sole exclusive property of WEX.

**2.9**   "<u>UCC</u>" shall mean the Uniform Commercial Code in effect in the State of Tennessee on the date this Agreement is entered into by and between the parties hereto.

**B.**   <u>**CONSTRUCTION.**</u> The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; the word "including" means including without limitation; and words in the singular include the plural and words in the plural include the singular.

**ARTICLE 3.**   <u>**PURCHASE AND SALE**</u>

**3.1**   <u>PURCHASE OF ACCOUNTS</u>. Client agrees to use and hereby appoints WEX as its sole factor.  Client hereby conveys, transfers, assigns and sells to WEX as absolute owner thereof all right, title and interest of its present and future Accounts, except for the Excluded Accounts.  Accounts shall be deemed acceptable for purchase and/or assignment in WEX's sole, absolute and unlimited discretion.  Client further grants, conveys, transfers, sells and assigns to WEX all of its interest in the goods or services sold by Client which gave rise to the Accounts, in all goods that may be returned by Customers; all Client's rights as an unpaid vendor or lienor; documents (including, without limitation) all Client's bills of lading; all Client's proof of delivery; all Client's contracts and contract rights (including, without limitation, all Client's rights in purchase orders in the assets sold and assigned); all Client's rights of stoppage in transit, replevin and reclamation relating thereto; all Client's rights in and the guarantees thereof, and all Client's rights against related third parties thereto.  Any goods so recovered or returned shall be set aside, and held in trust for WEX and such property shall be deemed the sole property of WEX. Client shall notify WEX promptly of all such returned or recovered goods.

**3.2**   <u>RECOURSE; TRUE SALE</u>.  All Accounts purchased by WEX from Client shall be deemed sold on a recourse basis to WEX and shall be the Obligation of the Client.  Each Account may be charged back to the Client in the event such Account remains unpaid for ninety (90) days from the date of the invoice or, at the sole discretion of WEX, at such time WEX receives notice of the Dispute.  It is the intention of WEX and Client that the sales of Accounts constitute true and actual sales of the Accounts from Client to WEX.  Client, as a protective measure against such characterization of the sale of the Accounts as a loan, grants WEX a security interest in the Accounts and other Collateral as set forth herein, which grant of security interest in the Collateral shall also serve as a lien in connection with the Obligations of Client hereunder.

**3.3**   <u>ACCOUNT DOCUMENTS</u>.  Client shall send all invoices evidencing all Accounts, together with all documents relating to such Accounts including all bills of lading, proof of delivery, contracts and purchase orders, directly to WEX ready for mailing to the Customers.  WEX will forward all invoices to the respective Customer, in which event the postage and clerical charges incurred by WEX will be an expense of WEX.  Each invoice evidencing an Account shall state in a manner satisfactory to WEX that the Account has been assigned and conveyed to WEX and is payable in United States currency to WEX only and WEX shall have the right to notify all Account Debtors that payment shall be made exclusively to WEX.  WEX shall have the right to verify directly with an Account Debtor that each Account is valid and complies with all representations and warranties regarding such Account as set forth herein.  At WEX's request, Client will promptly give WEX confirmatory written assignments of all Accounts with copies of the related invoices.

**3.4**   <u>ADVANCES</u>.  Upon delivery of the Accounts and receipt of those Accounts by WEX and subject to the terms and conditions herein, WEX shall have the option to promptly remit to Client the Advance Rate for each Account which conforms to the representations, warranties and terms herein or any portion thereof up to the Facility Amount, subject to WEX's right to maintain a Reserve.   WEX shall have the right to set a funding limit on advances for each Customer (the "Funding Limit"), which advances to such Customer may be limited to the Funding Limit.  Client acknowledges that WEX is not a credit agency and that its credit decisions are based in part on information received from third-party sources. In the event the total amount of outstanding Advances exceeds the Advance Rate (such amount an "Overadvance") WEX shall charge a three percent (3%) fee on the Overadvance (the "Overadvance Fee"), which Overadvance Fee shall be in addition to any other fees due and owing to WEX in connection with the Accounts.

Client Initials MW

**3.5** ACCOUNT PURCHASE FEES.  Client shall pay the Discount Fee in connection with the purchase of Accounts hereunder, which shall be due at the time of the purchase of each Account.  In the event the Discount Fees do not equal or exceed the Minimum Monthly Fee in any calendar month, Client agrees that the difference between the Minimum Monthly Fee and the Discount Fees actually paid during any calendar month may be deducted from the Client Advances or the Reserve.  Client shall pay all fees associated with the purchase and administration of the Accounts, WEX's due diligence and the preservation of the WEX's Collateral, including but not limited to reports from credit reporting agencies, wire transfer fees, delivery charges, bank fees and attorney's fees. The Client may be subject to an additional fee on non-factored invoice payments received for customers approved by WEX.

**3.6** BUSINESS SERVICES AGREEMENT/FUEL CARDS.  Notwithstanding any provision of this Agreement to the contrary, in the event Client enters into a Business Services Agreement with WEX, its parent WEX, LLC or any affiliated or related entities, Client hereby authorizes WEX to remit the Advance Rate and Reserve for each Account directly to WEX, LLC for availability in connection with such Business Services Agreement.   WEX shall be entitled to apply any funds in Client's fuel card account with WEX, LLC to satisfy any Obligations due and owing hereunder without advance notice to Client.

## ARTICLE 4.  GRANT OF SECURITY INTEREST

**4.1** GRANT OF SECURITY INTEREST.  In order to secure the prompt payment and performance of Client's present and future Obligations hereunder, Client hereby, upon the terms hereof and for value received, grants to WEX a first priority and exclusive security interest in all of Client's existing and later acquired assets, including but not limited to all Accounts, Chattel Paper (whether tangible or electronic), contracts and contract rights (including, without limitation, all Customer's rights in purchase orders in the assets sold and assigned), Documents (including, without limitation, all Customer's bills of lading and proof of delivery), Equipment, Instruments (including without limitation, promissory notes), Inventory, Investment Property, Letter of Credit rights, Letters of Credit, and all General Intangibles (including without limitation, payment intangibles and software), all Reserves in which Client has any interest or which are to become due and payable to Client, and all books and records of Client (whether tangible or electronic) relating to the assets set forth herein, whenever acquired and whether now or hereafter existing, wherever located and all Proceeds of each of the foregoing (all of which are hereinafter collectively called "Collateral").  The Collateral shall include the Excluded Accounts.

**4.2** SECURED OBLIGATIONS.  All of the foregoing Collateral shall secure the payment of all Obligations at any time owing to WEX, fixed or contingent whether arising under this Agreement, by operation of law or otherwise.   WEX is expressly authorized at any time to charge to Client, including but not limited to against any credit balance on WEX's books or any affiliate of WEX in Client's favor, whether matured or unmatured, the amount of any or all of the Obligations.  Client agrees that, with respect to the security interest granted by this Agreement, WEX shall have all of the rights and remedies of a secured party as provided by the UCC in addition to any and all remedies provided by any other applicable law and all rights and remedies provided for by this Agreement and by any other agreement; it being understood and agreed that that the security interest in the Collateral granted hereby secures any and all present and future Obligations of Client to WEX.

**4.3** ADDITIONAL DOCUMENTS.  Client shall execute and deliver to WEX such other documents and instruments, including, without limitation, UCC financing statements or amendments, as WEX may request from time to time. In addition, Client hereby authorizes WEX to file financing statements under the UCC with respect to the above Collateral.

## ARTICLE 5.  REPRESENTATIONS AND WARRANTIES

Client and those principals and agents authorized by Client to execute any Assignment Schedule each make the following representations, warranties and covenants set forth in this Article 5 below to WEX upon the execution of this Agreement, each of which shall be deemed to have been made upon the submission to WEX of an Assignment Schedule:

**5.1** CLIENT.  Client (a) is an entity duly organized, validly existing and in good standing under the laws of the state of its formation and is qualified and authorized to do business and is in good standing in all states in which such qualification and good standing are necessary or desirable; (b) has its principal place of business as set forth herein at the Client's address, maintains all of its books and records relating to its Accounts at the Client's address and has not and will not change its mailing address, principal place of business, or office in which Client's records are kept without first giving WEX written notice thereof; (c) has no Parent, Affiliate and/or Subsidiary that is not disclosed in writing to WEX; (d) is not and has at no time been affiliated with and does not own, control, or exercise dominion, in any way whatsoever, over any Customer; and (e) is not insolvent.

**5.2**    ACCOUNTS. In connection with the Accounts (a) Client has offered for sale all Accounts created since the last Assignment Schedule; (b) Client is the sole and absolute owner of each Account offered for sale, each Account offered for sale is sold free and clear of any liens, security interests or encumbrances and all supporting documentation for each Account has been provided to WEX; (c) Client has the full legal right to sell, assign and transfer each Account and such sale, assignment and transfer thereof does not contravene or conflict with the terms of any other agreement, commitment or instrument to which Client is a party; and upon Client's delivery of each Account, there will vest in WEX all of Client's right, title and interest in and to such Account; (d) all terms governing each Account are accurately reflected in the invoice and supporting documentation and each Account is undisputed and represents a sum certain owed by an Account Debtor, without offset or counterclaim and no Account offered for sale has any express or implied condition giving use to a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or any right to return basis; (e) each invoice clearly sets forth the assignment of the Account to WEX; (f) each Account represents Client's bona fide sale, delivery and acceptance of merchandise or full and complete performance of service to an Account Debtor; (g) Client shall not change the payment terms to any Account Debtor without the prior written consent of WEX; (h) no Account purchased hereunder or any payment made with regard thereto will at any time during or after termination of this Agreement be avoidable by any bankruptcy trustee under Title 11 of the United States Bankruptcy Code or by any creditor, whether under state or federal law, as a preference, fraudulent conveyance or otherwise; (i) each Account shall be absolutely enforceable against the Account Debtor in accordance with the express terms of the invoice, whether as to price, terms delivery, guaranty or quality; (j) Client has or will immediately and in any event not more than twenty-four (24) hours upon receipt of such information by Client, notify WEX of any Dispute, return, rejection, loss of or damage to merchandise, any request made by an Account Debtor for an extension of time to pay or any fact or circumstance with respect to any Account which is likely to effect the sum owing thereon or any other fact or circumstance that is likely to give rise to any Event of Default; (k) no Account or product or services billed pursuant to an Account shall be subject to a warranty or any future performance conditions; and (l) no Account is for work in progress or represents progress billing.

**5.3.**    FINANCIAL RECORDS.    In connection with the financial records of Client:  (a) each fact in any financial record, statement, books and records or other document Client has shown to WEX, either before or after the execution of this Agreement, is true and accurate and no information has since come to Client's attention to materially affect same; and (b) Client has contemporaneously as to each Account purchased, made the proper entry on its books and records recording the absolute sale of such Accounts to WEX. Client shall, for each year or increment thereof that this Agreement remains in effect, provide WEX with (i) a copy of its financial statements prepared in accordance with generally accepted accounting standards reflecting the financial condition of Client including, without limit, balance sheet and income/loss statements not later than thirty (30) days after the end of its fiscal year (presently December 31); (ii) copy of its current customer list and/or debtor aging at the end of each calendar year quarter; and (iii) a copy of its federal income tax returns within fifteen (15) days following the date said federal income tax returns are filed with the Internal Revenue Service. Client agrees to furnish WEX proof that all federal, state and any other taxes due and owing by Client have been paid within fifteen (15) days upon the request by WEX. WEX shall have full access to, and the right to audit and make copies from Client's books and records relating to Accounts or this Agreement.  In addition to the information requested in this Section 5.3, Client will furnish to WEX such financial statements and other information regarding Client's business affairs as WEX may request within five (5) business days of such request.

**5.4**    FINANCING STATEMENTS.    Unless authorized by WEX in writing, no financing statement identifying Client as Debtor, except as to WEX as Secured Party, is currently existing or may or has at any time during the term of this Agreement been authorized or has been filed in any public office.

**5.5**    TAXES.  Client has disclosed in writing to WEX any and all delinquent federal, state and/or local taxes; and in the event Client subsequently permits or suffers any delinquent tax at any time during the Term, Client will satisfy all such delinquent taxes within ten (10) days after Client receives notice or such additional time period as is acceptable to WEX.

**5.6**    CLIENT OPERATIONS.  In connection with operations of Client: (a) it is fully responsible for the acts, omissions and/or defalcations of its employees, including but not limited to the failure of any employee, agent, representative or assign to deliver any check or other payment belonging to WEX; (b) no inventory, equipment or other asset has been sold outside the ordinary course of Client's business without first giving WEX written notice and obtaining WEX's written consent; (c) each individual that executes and delivers the Assignment Schedule has the power and authority to do so on behalf of Client; (d) it shall at all times execute and deliver to WEX any and all documents that WEX deems desirable or necessary to effectuate the provisions of this Agreement; (e) it has no delinquent obligations under any organized labor contracts or pension obligation, and in the event Client permits or suffers any such delinquent obligations at any time during the Term, Client shall satisfy all such delinquent obligations within ten (10) days after Client receives notice or is otherwise advised of same; and (f) the proceeds of the advances shall be used solely by Client for working capital purposes in the ordinary course of business.

**5.7**    LOANS.    Client agrees that it will not lend any sum of money whatsoever to any individual or entity (other than advances to Client's drivers from time-to-time in the normal course of Client's business), nor act as guarantor, surety or endorser without WEX's prior written consent.

Client Initials MW

**ARTICLE 6.    EVENTS OF DEFAULT AND WEX RIGHTS AND REMEDIES**

6.1    OCCURRENCE OF EVENT OF DEFAULT.  Upon the occurrence of an Event of Default:  (a) all Obligations owed to WEX shall be immediately due and payable upon demand by WEX; (b) WEX shall have the right to charge a fee of Three Percent (3%) for the first thirty (30) days or increment thereof that an Account Purchased remains unpaid and, after such 30 day period, an additional Three Percent (3%) for each 15 day period or increment thereof that an Account Purchased remains unpaid (the "Default Rate"), which Default Rate shall be assessed on the face value of the Account and which Default Rate shall be in addition to any other fees due to WEX hereunder; (c) WEX shall have the right, at its discretion, to cease further advances and/or to terminate this Agreement; (d) WEX shall have the right to enforce all lien rights of Client; (e) Client hereby irrevocably authorizes any financial institution in which it has an account that so much of the funds necessary to cure Client's breach as set forth in writing by WEX to such financial institution shall be set aside to and for the exclusive benefit of WEX; (f) WEX may set off and apply the Collateral to the payment of Client's Obligations in such order and manner as WEX in its sole discretion shall determine, or settle, compromise or release, in whole or in part, any amounts owing on the Collateral, or prosecute any proceeding with respect to the Collateral, or extend the time of payment of any or all of the Collateral, or issue credits regarding the Collateral or sell, assign and deliver the Collateral (or any part thereof), at public or private sale and apply the net cash proceeds resulting from the exercise of any of the foregoing rights or remedies to the payment of the Obligations, in such order as WEX in its sole discretion, may elect, and Client and any Guarantor hereof shall remain liable to WEX for any deficiency.

6.2    ON LINE ACCESS.  All of Client's rights of access to WEX's online internet available services shall be provisional and may be terminated upon an Event of Default.  The information WEX makes available to Client online constitutes and satisfies any duty to respond to a Request for an Accounting or Request regarding a Statement of Account pursuant to § 9-210 of the UCC.

6.3    AVOIDANCE CLAIM.  Client agrees to indemnify and hold WEX harmless from any loss or liability arising out of the assertion of any avoidance claim and shall pay to WEX on demand the amount thereof.  For a period of two (2) years following the termination of this Agreement and payment in full of all Obligations hereunder, WEX shall be entitled retain its security interest in the Collateral as security for the avoidance claim indemnity.  This Section 6.3 shall survive termination of this Agreement.

6.4    DEFAULT EXPENSE REIMBURSEMENT.  Client shall reimburse WEX on demand for all costs incurred by WEX in the (i) enforcement for payment of the Accounts; (ii) all fees, costs and expenses of any kind and nature which WEX may incur in the filing notices, making lien or title examinations; and (iii) protecting, maintaining, preserving or enforcing agreements relating to the Accounts or any other matters related to this Agreement, all of which shall be added and deemed part of Client's Obligations hereunder.

6.5    PRIME RATE.  If the Prime Rate (as set forth by the Wall Street Journal) increases by fifty (50 bps) basis points or more in a calendar year, WEX reserves the right to increase the Discount Rate.

**ARTICLE 7.    TERM AND TERMINATION.**

7.1    TERM.  This Agreement shall remain in effect for twelve (12) months from the Effective Date (the "Term"), which Term shall be automatically extended for successive twelve (12) month periods unless Client provides written notice of cancellation delivered to an Member of WEX at least sixty (60) days prior to the expiration of the initial or any renewal Term.  Any modifications to this agreement, including all Exhibits and Schedules, shall constitute a new Effective Date commencing on such date the modification documents are executed by the Client.  Any notice of termination by Client, however, and notwithstanding payment in full of all Obligations by Client, is conditioned on Client's execution and delivery, to WEX, of a general release in a form satisfactory to WEX.  Client understands and agrees that this provision constitutes a waiver of its rights under § 9-513 of the UCC.  WEX shall not be required to record any terminations or satisfactions of any of WEX' security interests unless and until Client has executed and delivered to WEX said general release and Client shall have no authority to do so without WEX's express written consent.  The failure of Client to submit Accounts during the Term of this Agreement shall be considered a termination of this Agreement by Client.

7.2    TERMINATION FEE.  Any request by Client for an early termination must be in writing and received by WEX not less than sixty (60) days before the requested early termination date.  In the event that WEX agrees to grant such a request for early termination or there is an Event of Default under the Agreement that results in an early termination of this Agreement by either Client or WEX, Client shall pay WEX the higher of (i) ten percent (10%) of the Facility Amount; or (ii) the average monthly Discount Fee for the three (3) month periods prior to the date of such termination multiplied by the remaining month periods in the Term or any portion thereof (the "Termination Fee"), which Termination Fee shall be in addition to any other fees due to WEX hereunder.  Any and all fees and Obligations due to WEX hereunder shall survive termination of this Agreement.  The early Termination fee will be waived in the event the Client obtains traditional bank financing, which bank facility shall not be an asset based or factoring facility.  Notwithstanding anything to the contrary, and assuming no Event of Default has occurred pursuant to which WEX may terminate without notice, WEX may terminate the Agreement at any time by giving not less than ten (10) days' notice.  Notwithstanding any termination of this Agreement, all rights and security interests described herein and all of the terms, conditions, and provisions hereof shall continue in full force and effect until all transactions entered into prior to such termination have been fully concluded and all Obligations have been paid in full.  All representations, warranties, covenants and duties of Client shall survive the termination of this Agreement until the indefeasible payment in full of all Obligations.

**ARTICLE 8.    OPERATIONS AND PROCEDURES**

8.1    ACCOUNT ACTIVITY.   Information regarding the transactions occurring hereunder shall be maintained by WEX and available for review by Client through the WEX on line account detail.

**8.2**    TURNOVER OF FUNDS.  If any remittance or payment for an Account is made directly to Client by or on behalf of a Customer or should Client otherwise receive payment on any Account, Client shall immediately notify WEX and hold said payment in trust for WEX separate and apart from Client's own property and funds, and shall deliver said payment to WEX within three (3) business day in the identical form of checks, monies or other forms of payment received; and WEX shall have the right to endorse Client's name on all such remittances. Such amounts shall be deemed the sole property of WEX.  Upon receipt of any such remittance or payment by Client, WEX shall be entitled to charge Client a Misdirected Payment Fee if Client fails to surrender and deliver to WEX said check or payment instrument within one (1) business day of Client's receipt, which Misdirected Payment Fee shall mean the greater of (i) twenty percent (20%) of the amount of any payment; or (ii) One Thousand Dollars ($1,000), or (iii) thirty percent (30%) of the amount of any such payment which has been received by Client as a result of any action taken by Client to cause such payment to be made to Client, all in order to compensate WEX for the reasonably likely additional administrative expenses caused by this conduct.

**8.3**    COMPROMISE OF ACCOUNTS. Client agrees that it may not grant any allowance, credit or adjustment to an Account Debtor, or accept any return of merchandise, without express prior written consent of WEX.  WEX may, at its option, settle and/or compromise any Dispute without any liability to Client so long as the compromise is done in good faith.  WEX, as the sole and absolute owner of the Accounts, shall have the sole and exclusive power and authority to collect each such Account, through legal action or otherwise, and exercise, to the maximum extent permitted by applicable law, any other right now existing or hereafter arising with respect to any of such Accounts.  Any settlement made by WEX shall not relieve Client of any of its obligations under this Agreement and no Chargeback shall be deemed a reassignment of WEX' interest in the Accounts.

**8.4**    AUDITS.  WEX shall have the right to conduct an examination and verification of Client's financial, accounting, accounts receivable and invoicing records and supporting documents by an employee of WEX or a professional selected by WEX to verify the accuracy of such records (an "Audit") at any time, which Audit shall be at the sole expense of the Client.

**8.5**    CHARGE BACK.  If any Account is the subject of a Dispute as defined herein, in the event of a breach of the representations, warranties, covenants or duties of Client hereunder or an Account is not paid within ninety (90) days of the invoice date, Client hereby agrees, at WEX's sole option, to repurchase from WEX each such Account (or the unpaid portion thereof) for the amount of the Obligations associated with each such Account (the "Chargeback").    WEX shall have the right to assess a fee in the amount of two percent (2%) for each Account purchased by WEX that Client fails to repurchase (the "Chargeback Fee").  In the event of a Chargeback: (i) Client agrees to pay WEX the full amount thereof, and failing to do so, Client shall be responsible for all damages, including all expenses incurred by WEX in attempting to collect or enforce payment of such Accounts; and (ii) in addition to WEX's right to receive its other fees set forth in the Agreement, WEX shall be entitled to assess the Chargeback Fee.  The charge back of an Account shall not constitute a reassignment of the Account, and title thereto and to the goods represented thereby shall remain vested in WEX until all Obligations relating to such Account are paid in full.

**8.6**    PARTICIPATION.  Client acknowledges and agrees that WEX may sell participation interests in or assign all or any portion of its rights, obligations and interest under this Agreement and in the Collateral to any Person.

**8.7**    COMMUNICATIONS.  Client gives its irrevocable consent and authorization to WEX to disclose, release and exchange all information regarding Client and to communicate without limitation as to any matters related to Client with any third parties or any other persons claiming an interest or right in or the Collateral.

**8.8**    PERFORMANCE OF CLIENT OBLIGATIONS.  Nothing in this Agreement shall be construed to constitute WEX as agent for Client or to obligate WEX to assume any of Client's obligations with respect to any Account. WEX shall not assume or create any liability for any error or omission or delay occurring in a settlement, collection or payment of any Account. Notwithstanding the foregoing, if Client fails to perform any obligation that Client was required to perform in order to maintain the obligation of a Customer to make payments on an Account, WEX may perform or retain others to perform such obligation, at Client's sole expense and such expense shall constitute part of Client's Obligations described hereunder

**8.9**    ATTORNEY-IN-FACT. In order to facilitate the terms of this Agreement, Client hereby authorizes and appoints WEX as its lawful attorney-in-fact to collect and receive all payments from all Customers and to exercise at any time any of the following powers: (i) to receive, endorse, and deposit in WEX's name all payments received from Customers; (ii) to transmit to any party notice that Client has granted WEX a security interest in the Accounts or that any Account has been sold to WEX; (iii) to institute any proceedings deemed by WEX necessary to effect collection of any Account; (iv) to sign Client's name on any financing statement, or any amendment or continuation statement thereto with respect to any Account; and (v) to take any action deemed reasonable to fulfill the terms of this Agreement.

## ARTICLE 9.    GOVERNING LAW, JURISDICTION, WAIVER OF JURY TRIAL AND ATTORNEY'S FEES

**9.1**    GOVERNING LAW & JURISDICTION.  The laws of the State of Utah, without reference to any conflict of law provisions or decisions, shall govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement.

Client Initials MW

**9.2** WAIVER OF JURY TRIAL. EACH OF WEX, CLIENT AND ANY OBLIGOR HEREUNDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR ANY DOCUMENT ARISING HEREUNDER OR WITH RESPECT TO THE TRANSACTION CONTEMPLATED HEREIN WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES. ACCORDINGLY, EACH OF WEX, CLIENT AND ANY OBLIGOR HEREUNDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, INCLUDING BUT NOT LIMITED TO ANY CLAIM, COUNTERCLAIM, CROSS-CLAIM, THIRD PARTY CLAIM, DISPUTE, DEMAND, SUIT OR PROCEEDING ARISING OUT OF OR RELATED HERETO WHETHER, UNDER OR IN CONNECTION WITH THE AGREEMENT OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, INCLUDING ANY COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY AND AGREES THAT ALL SUCH PROCEEDINGS SHALL BE TRIED BEFORE A JUDGE AND NOT A JURY.

**9.3** ATTORNEY'S FEES. Client agrees to reimburse WEX for all reasonable attorney's fees, court costs and other expenses incurred by WEX arising under or related to this Agreement. Notwithstanding the existence of any law, statute or rule, in any jurisdiction that may provide Client with a right to attorney's fees or costs, Client hereby waives any and all rights to hereafter seek attorney's fees or costs thereunder.

**ARTICLE 10.** INDEMNIFICATION. Client will indemnify and hold harmless WEX and its officers, directors, principals, partners, members, managers, employees, agents, representatives and affiliates (each being an "Indemnified Party") from and against any and all losses, claims, actions, damages and liabilities arising under or related to this Agreement. This Section 10 shall survive termination of this Agreement.

**ARTICLE 11.** BREACH BY WEX. Client's sole remedy for any breach alleged to have been committed by WEX of any obligation or duty owed under the Agreement, any other agreement between Client and WEX or any duty or obligation arising out of or related to the Agreement shall be limited to the available funds, which available funds shall be the amount five (5) days after the time notice in writing of such breach is first given to WEX. Under no circumstances shall WEX be liable for any incidental, special or consequential damages, including, but not limited to, loss of goodwill, loss of profit, or any other losses associated therewith, whether WEX did or did not have any reason to know of a loss that may result from any general or particular requirement of Client.

**ARTICLE 12.** GENERAL PROVISIONS. (a) Client may neither assign any of its rights nor delegate any of its duties under the Agreement; (b) the Agreement contains the entire understanding of the parties hereto and relating to the subject matter hereof and is the final and complete expression of their intent and all agreements have been merged and finally integrated into this Agreement and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties and the parties acknowledge and agree that are not unwritten oral agreements between the parties; (c) no amendment, modification or waiver, oral or otherwise, with respect to any provision will in any event be effective unless the same is in writing with an original signature by an Officer of WEX and no email correspondence shall be considered a writing for purposes of an amendment, modification or waiver hereof; (d) no failure or delay on WEX's part in exercising any right, power or remedy granted to WEX hereunder will constitute or operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right set forth herein; (e) the relationship under the Agreement is principally that of seller and purchaser and that there is not now, and Client will at no time seek or attempt to establish, any fiduciary or confidential relationship between WEX and Client; (f) any notice or other communication by either party to the other in connection with an Event of Default, breach of the Agreement, termination of the Agreement or any written notice as provided for herein shall be in writing and shall be sent to the address set forth in the Preamble of the Agreement sent by (i) registered or certified US Mail; or (ii) a nationally recognized overnight delivery service, in each case properly addressed, with postage or fee prepaid and it shall be deemed to have been given when delivered to or refused by the addressee; (g) no email correspondence shall be considered a written notice for purposes of this Agreement; (h) the Agreement may be executed in any number of counterparts, each of which so executed shall be deemed an original and constitute one and the same agreement and may be by facsimile or by electronic transmission of an portable document format file or equivalent (also known as a "PDF file"), which shall be effective as delivery of a manually executed original counterpart of this Agreement; (j) in the event any one or more of the provisions contained in the Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and the Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein; (k) the Agreement shall be construed as if drafted jointly by the parties; (l) the Agreement is made and entered into for the sole benefit of the parties hereto; (m) the parties have read this Agreement, understand its contents, and represent that each has full and complete authority to sign this Agreement and that the execution, delivery and performance hereunder has been duly authorized by each party; (n) each of the parties hereto has had an opportunity to consult with its respective legal counsel prior to executing this Agreement; and (o) Client specifically acknowledges and agrees this Agreement is executed freely and voluntarily and without reliance upon any statement or representation of WEX or any of WEX's attorneys, agents, or other representatives in connection therewith except as set forth herein and there are no and Client is not relying on any written or oral representations not expressly written in this Agreement.

Client Initials MW

**IN WITNESS WHEREOF,** the parties have executed this Accounts Purchase Agreement as of the Effective Date.

**M & K WALKER & SONS TRUCKING LLC**        **WEX BANK**

By: _____        By:_____
milton walker (Mar 1, 2017)

     Name:  milton walker             Name: Michael Sturm
     Its:  co-owner             Its: Chief Credit Member

**NOTARY**

STATE OF GEORGIA          )
                          ) SS:
COUNTY OF _____    )

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, the foregoing Guaranty was acknowledged before me by _____, freely and voluntarily, and is personally known to me or has produced _____ as identification.

    WITNESS my hand and official seal in the County and State last aforesaid this _____ day of _____, 2017.

                    _____
                    Notary Public

                    _____
                    Typed, printed or stamped name of Notary Public
                    My Commission Expire

          Client Initials MW

**SCHEDULE 1**

**<u>EXCLUDED ACCOUNTS</u>**

Debtor in Possession Addendum to Accounts Purchase Agreement

This Debtor in Possession Addendum (the "DIP Addendum") to Accounts Purchase Agreement dated March 1, 2017 between M & K Walker & Sons Trucking, Inc. ("Seller") and WEX Bank ("Purchaser") (the "Original Purchase Agreement"),  is an amendment to and modification of the Original Purchase Agreement as of the date hereof.

Notwithstanding the Original Purchase Agreement, this DIP Addendum and the transactions contemplated thereunder (collectively the "Purchase Agreements") or other documents entered into between Seller and Purchaser in connection with the Original Purchase Agreement to the contrary, during the pendency of the Bankruptcy Case, as hereinafter defined, the following terms shall be a part of the Purchase Agreements, and to the extent there is a conflict between the terms of the Original Purchase Agreement and the terms of this Addendum, the terms of this Addendum shall control.  All terms not defined herein shall have the meaning ascribed in the Agreement, if any.

1.    Definitions: For the purposes of this Addendum:

"Bankruptcy Case" shall mean the Chapter 11 case filed in the United States Bankruptcy Court for the Northern District of Georgia ("Bankruptcy Court"), by Seller on _____, 2017, as Case No. 17-_____, in which Seller has remained in possession of its assets and continues to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

"DIP Financing" shall mean all purchases by Purchaser of Seller's accounts receivable pursuant to the terms of the Agreement and the Financing Orders, and the Purchaser's advances to Seller therefore.

"Final Order" shall mean the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case approving the Purchase Agreements and the other Purchase Documents, in form and substance satisfactory to the Purchaser, which order or judgment is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted.

"Financing Orders" shall mean the Interim Order or the Final Order, individually or collectively, as the case may be.

"Purchase Documents" shall mean collectively the Financing Orders, the Purchase Agreements and schedules, assignments and documents entered into between Seller and Purchaser in connection with the Purchase Agreements.

"Interim Order" shall mean the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case substantially in the form of Exhibit __ hereto, approving, inter alia, the Purchase Agreements and the other Purchase Documents, and (a) authorizing the purchase of the Seller's accounts receivable by Purchaser and incurrence by the Seller of the post-petition secured indebtedness in accordance with the Purchase Agreements and other Purchase Documents, and (b) approving the payment by the Seller of the Discount Rate and fees contemplated by the Purchase Agreements and the other Purchase Documents.

"Obligations" shall mean all obligations, indebtedness and all other debts or liabilities of Seller to

DIP ADD.

Purchaser whether pursuant to the Purchase Agreements, the other Purchase Documents, the Financing Orders or otherwise.

"Super-Priority Claim" shall mean, in relation to the Purchaser, a claim against the Seller in the Bankruptcy Case which is an administrative expense claim authorized and established by the Bankruptcy Court pursuant to Sections 364(c) and 507(b) of the Bankruptcy Code and having priority over any or all administrative expenses of the kind specified in Sections 503(b), 507(b) and 546(c) of the Bankruptcy Code.

"Termination Date" shall mean the earliest to occur of (i) the Maturity Date, (ii) the effective date of a confirmed plan of reorganization for the Seller, that is satisfactory to the Purchaser (which plan of reorganization shall in any event provide for (A) the Termination of the DIP Financing on or before the effective date of such plan of reorganization, and (B) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Purchaser against the Collateral (as defined in the Purchase Agreements), the superpriority administrative expense claim status of the claims of the Purchaser under the Purchase Documents, and the other rights and remedies of the Purchaser, in each instance, to the same extent as is provided in the Final Order), (iii) the date the Purchase Agreements are otherwise terminated for any reason whatsoever pursuant to the terms of such Purchase Agreements.

"Termination of the DIP Financing" shall mean, collectively, the termination of Seller's obligations under the Purchase Documents, and payment in full in cash of all Obligations.

2.      Conditions Precedent.

Purchaser's purchase of Seller's accounts receivable hereunder is subject, at the time of the making of each such purchase, to the satisfaction of the following additional conditions:

A.      The Financing Orders shall be in full force and effect, and shall not have been vacated, reversed or rescinded, and an appeal of such order shall not have been timely filed *and* a stay of such order pending appeal shall not be presently effective, and without the prior written consent of the Purchaser, such order shall not have been amended or modified.

B.      All proceedings taken in connection with the execution of this Purchase Agreement, all other Purchase Documents and all documents and papers related thereto and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related hereto and thereto) shall be reasonably satisfactory in form, scope and substance to the Purchaser.

C.      The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order shall be in form and substance satisfactory to the Purchaser and shall have been entered on such prior notice to such parties in accordance with Bankruptcy Rule 4001 (as determined by the Purchaser and Purchaser shall have received a copy of same, and such order shall be in full force and effect and shall not have been (i) stayed, vacated, revised or rescinded or (ii) without the prior written consent of the Purchaser, in its sole discretion, amended or modified.

D.      The Seller is in compliance in all material respects with the terms and conditions of the Financing Orders.

DIP ADD.

3.        Representations and Warranties

Seller represents and warrants to Purchaser that subject to the entry of the Interim Order, this DIP Addendum together with the Original Purchase Agreement creates as security for the Obligations purported to be secured hereby, a valid and enforceable lien on all of the Collateral subject thereto as such time or thereafter, and such liens constitute perfected and continuing liens on all such Collateral, having priority over all other liens on such Collateral securing all the Obligations due Purchaser, and enforceable against Seller. Pursuant to the terms of the Financing Orders no filing or other action will be necessary to perfect, validate or protect such liens and security interests.

4.        Certain Bankruptcy Matters.

        A.        Superpriority Administrative Expense Claim.

        (i)        Except to the extent provided otherwise in the Financing Orders, Seller hereby agrees that the Obligations shall (i) constitute superpriority allowed administrative expense claims in the Bankruptcy Case having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against Seller now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person (except to the extent of an agreed "Carve Out", if any) and fees due pursuant to 28 U. S. C. 1930(a), the establishment of which superpriority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Financing Orders, shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

        (ii)        Purchaser's liens and the administrative expense claims priority granted pursuant to clause (a) above have been independently granted by the Purchase Agreements, and may be independently granted by other Purchase Documents heretofore or hereafter entered into or the Financing Orders. The Purchase Documents supplement each other, and the grants, priorities, rights and remedies of Purchaser hereunder and thereunder are cumulative. In the event of a direct conflict between the Financing Orders, on the one hand, and any other document, on the other hand, the Financing Orders shall control.

        (iii)        Seller will not incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim or other superpriority claim or lien which is pari passu with or senior to the claims or liens, as the case may be, of Purchaser against Seller hereunder, or apply to the Bankruptcy Court for authority to do so,.

        B.        Purchaser's Liens.

        (i)        Purchaser's liens on the Collateral shall be deemed valid and perfected by entry of the Financing Orders. Purchaser shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the liens on Collateral granted by or pursuant to the Purchase Agreement and other Purchase Documents. If Purchaser shall, in its sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Purchaser's liens on the Collateral, all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the entry of the Financing Orders.

DIP ADD.

(ii)     The liens, lien priorities, superpriority administrative expense claims and other rights and remedies granted to the Purchaser shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Seller (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Bankruptcy Case, or by any other act or omission whatsoever.

C.     <u>Revision of Orders; Applications to Bankruptcy Court.</u>

(i)     Seller will not seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Financing Orders, except for any modifications and amendments agreed to in writing by Purchaser.

(ii)     Seller will not apply to the Bankruptcy Court for authority to take any action prohibited by the Purchase Agreements or the Purchase Documents (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Purchaser).

5.     <u>Events of Default.</u>

A.     In addition to the events creating a default under the Purchase Agreements, upon occurrence the following specified events shall also create an Event of Default under the Purchase Documents:

(i) Seller shall default in the observance or performance of provision of the Purchase Documents, or any other event shall occur or condition exist, the effect of which is to cause, or to permit Purchaser to accelerate the stated maturity of any Obligation; or

(ii)     The Bankruptcy Court fails to enter the Final Order within forty-five (45) days of the entry of the Interim Order (with such changes as Purchaser may agree to), or the Bankruptcy Court reverses, vacates or stays the effectiveness of the Financing Orders; or

(iii)     An order with respect to the Bankruptcy Case shall be entered by the Bankruptcy Court (or Seller shall file an application or motion for entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting the Bankruptcy Case to a Chapter 7 case; or

(iv)     Seller or any Party (with the support of Seller) shall file a plan of reorganization in the Bankruptcy Case, or an order shall be entered confirming a plan of reorganization in the Bankruptcy Case which does not (x) contain a provision for the Termination of the DIP Financing on or before the effective date of such plan and (y) provide for the continuation of the liens and priorities in favor of the Purchaser until such effective date; or

(v)      The Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to any person or entity with respect to assets of Seller where the aggregate value of the property subject to all such order or orders is greater than $1,000,000.00; or

(vi)     Any provision of the Purchase Documents shall for any reason cease to be valid or binding or enforceable against Seller (other than, in the case of the Interim Order, by virtue of the Final Order superseding it), or Seller shall so state in writing; or shall commence or join in any legal proceeding to contest in any manner

DIP ADD.

that the Purchase Documents constitutes a valid and enforceable agreement or Seller shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Purchase Documents; or

(vii)    Seller shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by Seller or by oral argument) any other Person's motion to, (1) disallow in whole or in part any of the Obligations arising under the Purchase Documents, (2) disallow in whole or in part any of the Obligations owed by Seller under the Purchase Agreements, (3) challenge the validity and enforceability of the liens or security interests granted in favor of Purchaser or (4) challenge the validity and enforceability of the liens or security interests granted under the Purchase Agreements; or

(viii)    (a) An order shall have been entered modifying the adequate protection obligations granted in any Financing Order without the prior written consent of Purchaser, (b) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by Purchaser of any amounts received in respect of the Obligations, (c) a motion or other request shall be filed with the Bankruptcy Court seeking authority to use any proceeds of any of the Collateral without the consent of Purchaser or (d) Seller shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not require the Termination of the DIP Financing; or

(ix)    If Seller is enjoined, restrained or in any way prevented by court order (other than an order of the Bankruptcy Court approved by Purchaser) from continuing to conduct all or any material part of its business affairs; or

(x)    Seller shall fail to (a) file, within the time required by the Bankruptcy Court, a plan of reorganization in the Bankruptcy Case that contains a provision for the Termination of the DIP Financing on the date of effectiveness of such plan and (b) obtain entry of a confirmation order from the Bankruptcy Court with respect to such a plan of reorganization containing such a provision;

then, and in any such event, and at any time thereafter, notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Financing Orders, the Purchaser may take any or all of the following actions, without further order of or application to the Bankruptcy Court and without prejudice to the rights of Purchaser to otherwise enforce its claims against Seller: (a) declare a Termination of the DIP Financing, whereupon any Discount Rate and fees shall forthwith become due and payable without any other notice of any kind; (b) declare all Obligations owing Purchaser by Seller due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Seller; (c) enforce, as Purchaser any and all of the liens and rights created pursuant the Purchase Documents; provided, that with respect to subpart (c) of this paragraph, Purchaser shall provide Seller (with a copy to counsel for any Committee appointed in the Bankruptcy Case and the United States Trustee with three (3) Business Days prior written notice.

B.    At the election of Purchaser, upon the occurrence of an Event of Default under the Purchase Agreements, the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with the Financing Orders so as to permit Purchaser full exercise of all of its rights and remedies, including, without limitation, all of its rights and remedies with respect to the Collateral. With respect to the Purchaser's exercise of its rights and remedies, Seller agrees, waives and, releases, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by Purchaser of its rights and remedies before the Bankruptcy Court or otherwise.

Agreed to as of the date hereof

DIP ADD.

Seller:                                           Purchaser:

M & K Walker & Sons Trucking, Inc.                WEX Bank


BY:_____          BY:_____

DIP ADD.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE**

| | |
|---|---|
| IN RE: | ) Case No. |
| **M & K Walker & Sons Trucking, LLC** | ) |
| **Debtor,** | ) **Chapter 11** |
| | ) |
| | ) **Judge:** |
| | ) |
| | ) |

### <u>CONSENT ORDER GRANTING MOTION TO APPROVE POST-PETITION FACTORING AGREEMENT AND USE OF CASH COLLATERAL</u>

At _____, this _____ day of _____, 2017, upon consideration of the

Debtor's Expedited Motion to Authorize Post-Petition Factoring Agreement and Use of Cash

Collateral, the Court finds:

1.      The Debtor and Debtor in Possession, M & K Walker & Sons Trucking, LLC,

Inc. (collectively "Debtor") filed its Chapter 11 bankruptcy case on _____, (the

"Petition Date");

2.      This Order is subject to, and WEX Bank, as purchaser and FleetOne Factorings,

LLC, a wholly owned subsidiary of WEX Bank, as servicer for WEX Bank ("FleetOne" and

WEX Bank are collectively referred to herein as the "WEX Entities") are entitled to the benefits

of, the provisions of 11 U.S.C. §§ 363. This Court has jurisdiction over this proceeding and the

parties and property affected hereby pursuant to 28 U.S.C. 157(a).

3.      Prior to the Petition Date, the Debtor was obligated to WEX Bank in the amount

of $_____ pursuant to a certain Account Purchase Agreement dated March 01, 2017

between the Debtor and Wex Bank (the "Purchase Agreement") and documents related to the

Purchase Agreement, attached hereto as Exhibit A.

146626203

1

4.    The obligation to WEX Bank is secured by a security interest in favor of WEX Bank upon all of the Debtor's assets pursuant to Financing Statements filed as follows (the "Financing Statements"):

| JURISDICTION | FILING DATE | FILING NO. | Debtor |
|---|---|---|---|
| Georgia | 2/15/2017 | 038-2017-002399 | M&K Walker & Sons Trucking, LLC |

5.    The security interests and liens granted to WEX Bank in the Purchase Agreement are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of WEX Bank.

6.    FleetOne, as servicer for WEX Bank, provides underwriting, credit, administrative and operational support, including the collection of the Accounts purchased by WEX Bank pursuant to the Purchase Agreement.

7.    The Debtor is a corporation which provides transportation services to third parties.

8.    Good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:

7.    The Debtor is authorized, on an interim basis, to sell and assign its accounts receivables to WEX Bank in accordance with the terms of this Order, the Purchase Agreement and WEX Bank's Debtor In Possession Addendum to Accounts Purchase Agreement attached hereto as Exhibit B (the Purchase Agreement and Addendum are collectively referred to as the "Purchase Documents").

146626203

8.      WEX Bank shall hereby be determined to be the owner of accounts receivable purchased by it, pursuant to the terms of the Purchase Documents and such purchased accounts receivable and all proceeds therefrom shall be the sole property of WEX Bank, and will not, when purchased by WEX Bank, constitute property of the estate, and shall be free and clear of any liens, interests, and encumbrance other than the rights granted to WEX Bank.

9.      Debtor shall not grant to any party any interest in its accounts receivable or proceeds thereof or priority in payment prior to, equal to, or greater than the lien or priority in payment hereby being accorded to WEX Bank with respect to the accounts receivable and proceeds thereof.

10.      Nothing in the Purchase Documents, or any of the documents executed and taken in connection with the post-petition purchase and sale of accounts receivable, or this order, shall give this Court the authority to require WEX Bank to purchase accounts receivable of Debtor or to advance funds to or for the benefit of Debtor, such being in the sole discretion of WEX Bank.

11.      The WEX Entitles are hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this order, or to the modification, vacating, or other amendment of this order by this Court.

12.      The entry of this order and execution, delivery, and performance under the Purchase Documents, or any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of the WEX Entities at law, in equity or otherwise, including, but not limited to, any right of the WEX Entities to request and to obtain relief under the Bankruptcy Code.

13.      Debtor may use the funds received from WEX Bank pursuant to the terms and conditions of the Purchase Documents, in the ordinary course of its business including up to $

146626203

3

in payment of professional persons employed pursuant to 11 USC § 327, provided that such fees shall have been approved by order of the Court. Debtor's rights to the collections on the accounts receivable purchased by WEX Bank shall only be as set forth in the Purchase Documents. Any collections of accounts receivable received directly by Debtor shall be immediately forwarded to WEX Bank.

14.    The Debtor is authorized, on an interim basis, to provide adequate protection, pursuant to sections 363(c)(2)(A) and 363(e) of the Bankruptcy Code, to WEX Bank pursuant to the terms and conditions set forth in this Order, pending a final hearing on Debtor's use of Cash Collateral.

15.    WEX Bank is hereby granted, as adequate protection for any diminution in the value of its prepetition collateral, and the proceeds thereof, and Cash Collateral, and the proceeds thereof, a valid, perfected and enforceable first-priority security interest (the "Replacement Liens") in and upon all of the categories and types of collateral in which WEX Bank held a security interest and lien as of the Petition Date (the "Prepetition Collateral"), including, without limitation, Cash Collateral, and the proceeds thereof (collectively, all of the collateral described in this paragraph, the "Collateral").

16.    The Replacement Liens granted by this Order: (i) are in addition to all security interests, liens and rights of set-off of WEX Bank existing on the Petition Date; and  (ii) are valid, perfected, enforceable and effective as of the date of the entry of this Order without any further action by the Debtor or Fleet One and without the necessity of the execution, filing or recordation of any financing statements, security agreements, vehicle lien applications, filings with the United States Patent and Trademark Office, mortgages or other documents.

146626203

4

17.    In addition to the Replacement Liens granted to WEX Bank pursuant to this Order, WEX Bank is hereby granted a superpriority administrative claim under Section 507(b) of the Bankruptcy Code (the "507(b) Claim") in the full amount allowable under Section 507(b) and the Bankruptcy Code.  Such 507(b) Claim shall be allowed and have priority in payment over all other costs and expenses, now existing or hereafter arising, of the kind specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), and 1114 of the Bankruptcy Code.

18.    Notwithstanding anything to the contrary, the Replacement Liens and 507(b) Claim granted to WEX Bank pursuant to this Order shall be subject and subordinate to the amounts payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a).

19.    The Debtor is authorized pursuant 11 U.S.C. §363(c) (2) to sell its accounts receivables to WEX Bank, under the terms of this Order and the Purchase Documents.

20.    FleetOne is authorized to provide underwriting, credit, administrative and operational support, including making advances to Debtor upon the purchase the accounts receivable by WEX Bank and the collection of the Accounts purchased by WEX Bank pursuant to the Purchase Documents.

21.    As WEX Bank's prepetition purchase of the Debtor's accounts receivable removed those receivables from this bankruptcy estate, the automatic stay of 11 U. S. C. 362 does not prohibit WEX Bank from collection of those receivables.

22.    The Debtor is authorized to use the Cash Collateral in accordance with this Stipulated Order and Purchase Documents until the earlier of (a) the failure of Debtor to perform any of obligations under this Order or the Purchase Documents, (b) conversion of the Chapter 11 case to a

146626203

case under Chapter 7 of the Bankruptcy Code, or (c) payment in full of Fleet One's Indebtedness, including costs and expenses of Fleet One.

23.    The Debtor shall execute any documents and take actions required in connection with or as may be necessary or appropriate to carry out the intent of this Order authorizing use of Cash Collateral ("Cash Collateral Order").

24.    This Cash Collateral Order is sufficient and conclusive evidence of the priority, validity and perfection of the security interests in and liens upon the property of the estate of Debtor (including the Replacement Liens) granted to WEX Bank, without the need of any additional actions being taken by or on behalf of WEX Bank, including but not limited to the filing or recording of Uniform Commercial Code financing statements; provided however, in the event WEX Bank elects to make such filings or recordations, Debtor will execute all documents reasonably requested by WEX Bank to do so..

25.    The provisions of this Cash Collateral Order shall inure to the benefit of Debtor and the WEX Entities, their successors and assigns, and shall be binding upon the successors and assigns of the parties.

26.    If the Debtor defaults under this Cash Collateral Order, WEX Entities shall be granted a hearing on an emergency basis, upon application, on the issue of the termination of the Debtor's authority to use Cash Collateral.

27.    It shall be a default under the terms of this Order if the Debtor directly or indirectly participates in or supports a plan of reorganization that modifies amends or supersedes any term or condition of this Cash Collateral Order or the Factoring Documents without the written agreement of WEX Bank.

146626203

28.     If the Debtor or a trustee (if appointed), continues to use Cash Collateral after the expiration of this Order and while WEX Bank Indebtedness is still outstanding, WEX Bank is deemed to have been granted continuing, uninterrupted adequate protection pursuant to the terms and conditions of this Order as if this Order was at all times still in full force and effect.

29.     Debtor shall serve a copy of this Order on the 20 largest unsecured creditors), taxing bodies, secured creditors, priority claimants, and equity security holders and other parties as directed by the Court and shall file a certificate of service within five days from the date of this Order.

30.     Unless objections to this Order are filed on or before _____, 2017, this Order shall become final without further hearing or notice on _____, 2017.  In the event that objections are filed a hearing will be held on _____, 2017 at ___:___ a.m. /p.m. in Courtroom __, _____.  Objections or responses to this Order must be filed with the Clerk of the Bankruptcy Court and served on (i) counsel to the Debtor; (ii) counsel to WEX Bank and FleetOne Factoring, LLC, Richard H. Fimoff, Robbins, Salomon & Patt, Ltd., 180 N. LaSalle Street, Suite 3300, Chicago, IL 60601, 312-456-0185, rfimoff@rsplaw.com; (iii) the Office of the United States Trustee.

31.     Any extension of the term of this Order may be filed upon consent, and served on required notice parties, provided that there are no material changes to the other provisions of the Order.

[End of Document]

Prepared and presented by:

/s/ Will Geer
Will Geer
146626203

7

Georgia State Bar No. 940493
Law Office of Will B. Geer, LLC
333 Sandy Springs Circle, NE
Suite 225
Atlanta, Georgia 30328
T: (678) 587-8740
F: (404) 287-2767
willgeer@willgeerlaw.com


Consented to by:

/s/ Richard Fimoff (w/ express permission)
Richard H. Fimoff
Robbins, Salomon & Patt, Ltd.
180 N. LaSalle Street
Suite 3300
Chicago, IL 60601
D: 312-456-0185
F: 312-782-6690
M: 312-318-1380
rfimoff@rsplaw.com

146626203

8